## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

FAUSTINO XAVIER BETANCOURT
COLÓN,

      Plaintiff,

      v.

PUERTO RICO CONVENTION CENTER
DISTRICT AUTHORITY, et al.,

      Defendants.

CIVIL NO.: 22-1288 (MAJ)

## REPORT & RECOMMENDATION

### I.  PROCEDURAL BACKGROUND

On October 3, 2022, Plaintiff Mr. Faustino Xavier Betancourt Colón ("Plaintiff") filed an amended complaint against Defendants SMG Latin America, LLC ("SMG") and the Puerto Rico Convention Center District Authority ("the Authority") (collectively "Defendants") alleging violations of the provisions of Title II and Title III of the Americans with Disabilities Act, 42 U.S.C.A. § 12131 et seq. and § 12182 et seq. ECF No. 36 at 1. In the amended complaint, Plaintiff alleges that he suffers from the following physically disabling conditions: congestive heart failure (20 percent heart function), hydrocephalus, foot abnormalities, and obesity. ECF No. 36 at 4. Plaintiff also alleges that on November 12, 2021 and on "previous occasions", he visited the Puerto Rico Coliseum "José Miguel Agrelot" located at 500 Av. Arterial B, in San Juan, Puerto Rico ("the Coliseum") as both a "bona fide client" and a "tester" and personally "found architectural barriers in the parking lot and inside the Coliseum" which, as they related to his disability, interfered with his ability to "use and enjoy the goods, services, privileges and accommodations" offered at the Coliseum. ECF No. 36 at 2–3, 6–7. Specifically, Plaintiff alleges

that he encountered unevenness in the transition points from a pedestrian sidewalk to the parking area; deficiencies in the number, dimensions, construction, and configuration of the accessible parking spaces; problems with the signage and symbols contained in the parking area; deficiencies in the entrances, access ramps, and signs posted on the entrance; failures in the checkout aisles, cafeteria counters, and ticket sale counters; and the maintenance of discriminatory policies and practices toward disabled persons with regard to the sale of tickets at the Coliseum and the availability of accessible seating. ECF No. 36 at 8–14. Plaintiff further alleges that there are additional barriers which have not been "discovered" at the time of the filing of his complaint. ECF No. 36 at 14.

In light of the aforementioned barriers, Plaintiff alleges that the Authority is a public entity under the meaning of Title II of the ADA, 42 U.S.C.A. § 12131 et seq., and which owns the Coliseum. As such, Plaintiff brings a claim for disability-based discrimination against the Authority under Title II of the ADA and alternatively—should the Authority not be a public entity—under Title III of the ADA, 42 U.S.C.A. § § 12182 et seq. ECF No. 36 at 5, 17. Under Title II, Plaintiff claims that he was denied "full and equal enjoyment and access to the [Coliseum's] goods, services, privileges, and accommodations during each visit." ECF No. 36 at 16; see 42 U.S.C.A. § 12132.

With regard to SMG, Plaintiff alleges that SMG holds a contract with the Authority making it responsible for "operating, maintaining the building, negotiating and obtaining the licenses and permits to keep the [Coliseum] in operation" and is therefore liable for disability-based discrimination under Title III of the ADA, 42 U.S.C.A. § § 12182 et seq. ECF No. 36 at 5–6, 17. Under the Title III claims brought against both Defendants, Plaintiff alleges claims for failure to remove architectural barriers in an existing facility when the removal of those barriers

was readily achievable in violation of 42 U.S.C.A. § 12182(b)(2)(A)(iv) and § 12182(b)(2)(A)(v) and  for failure to make reasonable modifications in policies, practices, or procedures necessary to accommodate Plaintiff's disability in an existing facility in violation of 42 U.S.C.A. § 12182(b)(2)(A)(ii). ECF No. 36 at 19–20. Plaintiff also alleges failure to design and construct an accessible facility in violation of 42 U.S.C.A. § 12183(a)(1) and failure to alter a facility in a way so that it is readily accessible to individuals with disabilities in violation of 42 U.S.C.A. § 12183(a)(2). ECF No. 36 at 19–20. As remedies for the aforementioned violations, Plaintiff requests injunctive relief, nominal damages, attorney's fees, costs, and litigation expenses. ECF No. 36 at 21, 22.

In response to the amended complaint, both SMG and the Authority filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). ECF Nos. 37, 38, 39. Both motions to dismiss are currently pending before the court and will be addressed in turn.

## II.  LEGAL STANDARD

A defendant may move to dismiss an action pursuant to Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "a plausible entitlement to relief." Rodríguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007)). "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that compels us 'to draw on' our 'judicial experience and common sense.'" Schatz v. Republican State Leadership Committee, 669 F.3d 50, 55 (1st Cir. 2012) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)).

Such a task requires a two-pronged analysis. "First, the court must sift through the

averments in the complaint, separating conclusory legal allegations (which may be disregarded) from allegations of fact (which must be credited)." Rodríguez-Reyes v. Molina-Rodríguez, 711 F.3d 49, 53 (1st Cir. 2013). "Similarly, a court does not accept as true allegations that while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross the line between the conclusory and the factual." Air Sunshine, Inc. v. Carl, 663 F.3d 27, 33 (1st Cir. 2011) (internal quotations omitted). In short, "to avoid dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" Torres v. Bella Vista Hosp., Inc., 523 F. Supp. 2d 123, 133 (D.P.R. 2007) (quoting Twombly, 550 U.S. at 555, 570).

"Second, the court must consider whether the winnowed residue of factual allegations gives rise to a plausible claim of relief." Air Sunshine, Inc., 663 F.3d at 33. In making this determination under Rule 12(b)(6), the court must limit its focus to the allegations of the complaint and "accept as true 'all well-pleaded factual averments and indulg[e] all reasonable inferences in the plaintiff's favor.'" Doyle v. Hasbro, Inc., 103 F.3d 186, 190 (1st Cir. 1996) (quoting Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996)). In addition to the complaint, the court can consider "(a) 'implications from documents' attached to or fairly 'incorporated into the complaint,' (b) 'facts' susceptible to 'judicial notice,' and (c) 'concessions' in plaintiff's 'response to the motion to dismiss.'" Schatz, 669 F.3d at 55 (quoting Arturet-Vélez v. R.J. Reynolds Tobacco Co., 429 F.3d 10, 13 n.2 (1st Cir. 2005)). "We appropriately draw on our 'judicial experience and common sense' in evaluating a complaint, but we may not disregard factual allegations 'even if it strikes a savvy judge that actual proof of those facts is improbable.'" Manning v. Boston Medical Center Corp., 725 F.3d 34, 43 (1st Cir. 2013). Although all inferences must be made in plaintiff's favor, the court need not accept "bald

assertions, unsupportable conclusions, periphrastic circumlocutions, and the like." Aulson, 83

F.3d at 3. Dismissal under Rule 12(b)(6) is appropriate only if the facts alleged, taken as true, do

not warrant recovery. Id.

## III.  ANALYSIS

### A.  CONCLUSORY ALLEGATIONS IN THE COMPLAINT

Both Defendants argue that Plaintiff's allegations in the amended complaint must be

dismissed because they are unspecific, conclusory, and speculative. ECF No. 37 at 3, 10–11;

ECF No. 39 at 31–32. Plaintiff responds that his allegations are properly drafted short statements

showing that he is entitled to relief. ECF No. 47 at 10. Accordingly, the court begins prong one

of the Rule 12(b)(6) inquiry by sifting "through the averments in the complaint, separating

conclusory legal allegations (which may be disregarded) from allegations of fact (which must be

credited)." Rodríguez-Reyes, 711 F.3d at 53. In total, Plaintiff makes nineteen short statements

setting forth alleged barriers he encountered at the Coliseum which manifested as architectural

design barriers, policies, and practices and which are "related to his disability and mobility

limitations." ECF No. 36 at 8–14. Generally, Plaintiff's short statements adequately set forth a

plausible claim for relief. However, three of Plaintiff's short statements contain allegations

which are conclusory and must be winnowed from the complaint. The court will examine each of

these three allegations and, by way of example, contrast them with allegations contained in the

Plaintiff's amended complaint which adequately set forth a plausible claim of relief.

Plaintiff adequately identifies various problems in the parking lot of the Coliseum. For

example, Plaintiff alleges that "[r]egarding parking lots, the requirement that one sixth of the

accessible parking lots have the dimensions of the 'van' category is not met. . . . Possible

solutions: Reconfigure parking lot using paint." ECF No. 36 at 8. He also states that "[t]he slope

in the parking lots and spaces adjacent to the parking lots is inconsistent with the requirements of

the applicable regulations, since its inclination is greater than 1:48 in all directions. . . . Possible

solutions: level surfaces, relocate parking lots in compliance with accessible parking location

guidelines." ECF No. 36 at 9. These allegations suffice to raise a right to relief above the

speculative level, as they specify (1) what constitutes the alleged barrier and (2) adduces facts as

to *how* or *why* the barrier does not comply with the applicable regulations under the ADA, before

(3) alleging a plausible claim on how the removal of the barrier is readily achievable. See

Medina-Rodríguez v. Fernández Bakery, Inc., 255 F. Supp. 3d 334, 343 (D.P.R. 2017) ("Because

the complaint sets forth twelve architectural barriers in violation of the ADA, each of which may

be removed, Medina has pled sufficient facts to bring a Title III ADA claim.").

These statements can be contrasted with the following conclusory statements which

Plaintiff alleges in the complaint, namely paragraphs "d)", "e)", and "k)":

> d) The configuration and dimensions of the accessible parking lots are
> substantially inconsistent with the requirements of the applicable regulations.
> 2010 ADAAG § 502.2, 502.3. Possible solution: reconfigure the parking lot by
> using paint.

> e) The configuration and dimensions of the spaces adjacent to the parking lots are
> substantially inconsistent with the requirements of the applicable regulations.
> 2010 ADAAG § 502.2, 502.3, 503.3.3. Possible Solutions: reconfigure the
> parking lot by using the appropriate paint according to the regulations.

> . . .

> k) The entrance does not meet the requirements of the applicable regulations. As
> for the entrances that are not accessible, these do not have signs indicating the
> location of the accessible entrance. ADAAG 2010 § 216.6. Possible solutions:
> reconfigure the entrance according to the required regulations.

ECF No. 36 at 8–10.

In the three statements denoted above, the Plaintiff merely identifies a feature of the

Coliseum's facilities and in a conclusory fashion asserts that the specific feature "is substantially

inconsistent with" or "does not meet the requirements of the applicable regulations." ECF No. 36 at 9–10. Unlike the statements asserting a plausible claim for relief already discussed, these four statements fail to identify *how* or *why* the identified feature does not comply with ADA regulations (e.g. "the requirement that one sixth of the accessible parking lots have the dimensions of the 'van' category is not met" or "its inclination is greater than 1:48 in all directions"). Upon examining these deficient statements of fact, a reader is left to wonder how exactly the alleged barrier fails to comply with the applicable regulations under the ADA. While in each statement Plaintiff cites a provision or provisions of the 2010 edition of the Americans with Disabilities Act Accessibility Guidelines ("ADAAG"), a reader who seeks out the guidelines is nevertheless left to divine how exactly the feature in the facility is inconsistent with those standards.

For example, with regard to paragraph "k)", the Plaintiff cites 2010 ADAAG 216.6 which provides,

> Where not all entrances comply with 404, entrances complying with 404 shall be identified by the International Symbol of Accessibility complying with 703.7.2.1. Directional signs complying with 703.5 that indicate the location of the nearest entrance complying with 404 shall be provided at entrances that do not comply with 404.

2010 ADAAG 216.6. Upon turning to 2010 ADAAG 404, a reader finds that this guideline sets forth all of the applicable requirements for "Doors, Doorways, and Gates" and provides, by way of example, a multitude of regulations concerning everything from "Manual Doors, Doorways, and Manual Gates" to "Revolving Doors, Gates, and Turnstiles" and specifying required widths, "maneuvering clearances", floor and ground surfaces, heights of raised thresholds, door and gate opening forces, closing speed of doors, and controls. See e.g. 2010 ADAAG 404. A reader must then attempt to guess as to which one or more of the foregoing multitudinous requirements the

"entrance" fails to meet thereby requiring the postage of a sign in compliance with 2010
ADAAG 216.6. Such deficiencies render this statement of fact so threadbare and speculative that
it fails to cross the line between the conclusory and the factual and should be dismissed.

Additionally, paragraphs and "d)" and "e)" make the same error. Paragraph "d)" cites
2010 ADAAG § 502.2, 502.3 for the allegation that the configuration and dimensions of the
accessible parking lots are substantially inconsistent with the requirements of the applicable
regulations. ECF No. 36 at 8–9. However, 2010 ADAAG § 502.2 and 502.3 reference multiple
requirements for parking spaces, including that they comply with certain minimum widths,
lengths, markings, and shall be accompanied by access aisles. 2010 ADAAG § 502.2, 502.3.
Plaintiff's statement contained in paragraph "d)" fails to specify which part of these guidelines
are not met by the "configuration and dimensions" of the accessible parking lot. Likewise,
paragraph "e)" cites the same provisions of the ADAAG and adds 2010 ADAAG § 503.3.3
which requires that access aisles "be marked so as to discourage parking in them." Plaintiff does
not state whether the deficiencies with regard to parking spots in either paragraphs "d)" and "e)"
regard the length, width, markings, or the lack of access aisles. A reader is left to guess what
exactly is wrong with those features of the Coliseum, and therefore those statements constitute
conclusory and speculative allegations.

The above requirements of pleading are not onerous. The above paragraphs would have
been satisfactory if, for example, they resembled paragraph "h)" or "o)" of the amended
complaint. In paragraph "h)", Plaintiff states that "the positioning of the parking lot signs is
substantially inconsistent with the applicable regulations" and cites ADAAG 2010 § 502.6. That
ADA Accessibility Guideline provides that: "Parking space identification signs shall include the
International Symbol of Accessibility complying with 703.7.2.1. Signs identifying van parking

8

spaces shall contain the designation 'van accessible.' Signs shall be 60 inches (1525 mm) minimum above the finish floor or ground surface measured to the bottom of the sign." ADAAG 2010 § 502.6. The Plaintiff's statement contained in paragraph "h)" suggests that a reasonable solution to the deficiency could be to place signage at the height and in the position required by the regulations. While not an ideal statement as it requires some analysis to unpack, the allegation at least clarifies that the portion of ADAAG 2010 § 502.6 to which Plaintiff refers is that the signs have not been placed 60 inches above the surface of the ground. Such a statement of fact is adequate to support a plausible claim for relief.

Or consider paragraph "o)" of the amended complaint. At first glance paragraph "o)" appears to be conclusory, asserting that the checkout aisle and cafeteria counters have "dimensions and spaces" which are "substantially inconsistent with the applicable regulations." ECF No. 36 at 15. However, the statement later proceeds to identify specifically which part of the 2010 ADAAG regulations are violated by those features. ECF No. 36 at 11. Plaintiff lists "ADAAG 2010 § 904.3.1" and clarifies in parentheses "(36" checkout aisle)" and "ADAAG 2010 § 904.3.2 (surface not higher than 38") . . . ." ECF No. 36 at 11. However, the three deficient statements addressed here fail to even identify any analogous details even parenthetically. In short, because paragraphs "d)", "e)", and "k)" all fail to identify with specific facts what applicable regulation under the ADA those features at the Coliseum have violated, they are conclusory and do not assert a plausible claim for relief. As such, with regard to paragraphs "d)", "e)", and "k)" SMG's motion to dismiss should be granted.

### B. STANDING TO SUE FOR UNENCOUNTERED BARRIERS

SMG also takes issue that in the amended complaint Plaintiff seeks relief for "unencountered" and "undiscovered" barriers and argues that Plaintiff cannot have standing to

seek relief for alleged barriers about which he was not aware. ECF No. 54 at 5. Plaintiff responds

that in the amended complaint he only seeks relief for barriers "'found and others not discovered

at the moment'" because such barriers would interfere with his "complete and equal' access" to

the Coliseum, and as such he "intends to locate all barriers that are present on the Property, even

if they are not described in the Amended complaint, in order to fully comply with the

requirements of the ADA." ECF No. 59 at 5 (citing ECF No. 36 at 14).

      Courts differ as to whether a plaintiff has standing to bring suit under the ADA for

barriers which the plaintiff has not encountered himself. The Eleventh Circuit Court of Appeals

in Norkunas v. Seahorse NB, LLC, 444 F. App'x 412 (11th Cir. 2011) held that a plaintiff did not

have standing to bring claims regarding barriers he had not personally encountered, and that the

plaintiff could not assert ADA claims against "an entire facility . . . once one barrier is

encountered." Norkunas, 444 F. App'x at 416. Even so, a finding of lack of standing regarding

certain unencountered barriers does not necessarily prevent a plaintiff from amending the

complaint to add additional barriers once encountered. McBay v. City of Decatur, Ala., 2014 WL

1513344, at *7 (N.D. Ala. Apr. 11, 2014) ([P]laintiffs do not have standing to raise violations of

the ADA . . . that they have not yet experienced. . . . however, this ruling in no way limits

[plaintiffs'] ability to amend [their] complaint.") (internal quotations omitted).

      The Eighth and Ninth Circuits have taken a different approach. The Eight Circuit in

Steger v. Franco, Inc., 228 F.3d 889 (8th Cir. 2000) addressed the ADA claims of a blind

plaintiff alleging a multitude of alleged barriers in the defendant's facility, and concluded that

the plaintiff "need not encounter all of these barriers to obtain effective relief." Steger, 228 F.3d

at 984. The court reasoned that "[t]he effect of such a rule would be piecemeal compliance. To

compel a building's ADA compliance, numerous blind plaintiffs, each injured by a different

barrier, would have to seek injunctive relief as to the particular barrier encountered until all barriers had been removed. This not only would be inefficient, but impractical." Id. The Ninth Circuit expressed its agreement in Pickern v. Holiday Quality Foods Inc., 293 F.3d 1133 (9th Cir. 2002), stating that a plaintiff "need not necessarily have personally encountered all the barriers that . . . bar his access . . . in order to seek an injunction to remove those barriers." Pickern, 293 F.3d at 1138 (citing Steger, 228 F.3d at 889); see also Doran v. 7-Eleven, Inc., 524 F.3d 1034, 1047 (9th Cir. 2008) ("We hold that Doran has standing to sue for injunctive relief for all barriers in the North Harbor 7–Eleven store related to his specific disability, including those identified in his expert's site inspections.").

The First Circuit has recognized the conundrum of barriers not yet encountered by an ADA plaintiff but has not ruled directly on the issue. Suárez-Torres v. Panadería y Repostería España, Inc., 988 F.3d 542, 555 (1st Cir. 2021) ("Several circuits have held that an ADA plaintiff who has filed suit after encountering a barrier in a place of public accommodation may challenge all other barriers on that property related to her disability, including those of which she was unaware when she initially filed her complaint. . . . However, this case does not present that issue."); MacDonald v. Cape Cod Cent. R.R., Inc., 2019 WL 3818298, at *3 (D. Mass. Aug. 14, 2019) ("the First Circuit has not addressed the precise issue at hand [regarding unencountered barriers]"). However, at least one district court located in the First Circuit has allowed a Plaintiff to assert claims for unencountered barriers, reasoning that the First Circuit Court of Appeals has nevertheless "suggested that it would agree with the reasoning of the Eighth and the Ninth Circuits." MacDonald, 2019 WL 3818298, at *3 (citing Dudley v. Hannaford Bros. Co., 333 F.3d 299, 305 (1st Cir. 2003) ("The proposition that . . . a disabled person must subject himself

to repeated instances of discrimination in order to invoke the remedial framework of Title III . . . turns the language of [the ADA] on its head.").

Here, the court finds the reasoning of the Eight Circuit in <u>Steger</u> persuasive. Plaintiff has already identified sixteen barriers which he alleges he encountered and seeks to remedy, enough to confer standing in this case with regard to those claimed barriers. However, to also require all other undiscovered barriers in the Coliseum to be identified by other plaintiffs with the same disability who have directly encountered that barrier would be inefficient and impractical. If the goal in providing injunctive relief is force a facility to comply with the strictures of the ADA, for the sake of completeness the Plaintiff should be allowed to assert claims with regard to any and all barriers which are related to his disability, even if not encountered at the time of the filing of the complaint. Because Plaintiff has adequately alleged sixteen other barrier and because it would be inefficient to require a separate plaintiff to identify any other remaining barriers, Plaintiff has standing to assert claims for other undiscovered barriers in the facility related to his disability. Whether or not Plaintiff will be allowed to conduct a site inspection to discover the alleged unencountered barriers is a separate question regarding the scope of discovery rather than an issue of standing. It should be left to the court's discretion at the discovery stage to determine the scope of an inspection which is reasonably related to plaintiff's disability. <u>Doran</u>, 524 F.3d at 1047 ("The scope of discovery and claims should then naturally permit challenge to any barriers to use related to that person's disability."). In sum, SMG's request to dismiss Plaintiff's claim for unencountered barriers based on lack of standing should be denied.

### C.  PLAINTIFF'S REMAINING CLAIMS UNDER TITLE III OF THE ADA

#### a.  Plaintiff's Claims for Reasonable Modification

Next, Defendants argue that Plaintiff's Title III claims should be dismissed because Plaintiff failed to plead that he made a pre-litigation request for reasonable modification pursuant to the prima facie case under Title III of the ADA. ECF No. 37 at 7–9; ECF No. 39 at 31. Plaintiff responds that he is not required to affirmatively plea that made a pre-litigation request to the Defendants as part of his prima facie case under Title III of the ADA. ECF No. 47 at 2–5. Plaintiff maintains that even if he was required to so plead, he effectively made a request for reasonable modification when he filed the complaint against the Defendants. ECF No. 59 at 2, 4.

"Title III proscribes disability-related discrimination in the provision of public accommodations such as hotels, restaurants, and theaters." Iverson v. City Of Bos., 452 F.3d 94, 99 (1st Cir. 2006) (citing 42 U.S.C.A. §§ 12182 and 12184). The prima facie case under Title III of the ADA requires that the Plaintiff demonstrate that "(1) he or she has a qualified disability under the ADA, (2) that the defendant operates a place of public accommodation, and (3) that the plaintiff was discriminated against as a result of his or her disability." Medina-Rodriguez, 255 F. Supp. 3d at 341. As relevant to the claims raised by Plaintiff in the complaint the ADA defines discrimination with regard to existing facilities as:

> (ii) a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations; . . .

> (iv) a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities . . . where such removal is readily achievable; and

> (v) where an entity can demonstrate that the removal of a barrier under clause (iv) is not readily achievable, a failure to make such goods, services, facilities, privileges,

advantages, or accommodations available through alternative methods if such methods are readily achievable.

42 U.S.C.A. § 12182(b)(2)(A)(ii), (iv), (v). Additionally, for facilities which were designed and constructed "for first occupancy later than" January 26, 1993 or "with respect to a facility or part thereof that is altered", a defendant's actions may constitute discrimination if it fails to design, construct, or alter the facility in a way so that they are not "readily accessible to and usable by individuals with disabilities[.]" 42 U.S.C.A. § 12183(a)(1), (2).

In the amended complaint, Plaintiff raises claims under all of the above provisions of Title III of the ADA. Plaintiff pleads that he believes the Coliseum "was designed for first occupancy after January 26, 1993" and was "altered" after January 26, 1993. ECF No. 36 at 18. In the alternative, Plaintiff pleads that "if the [Coliseum] was not designed and built for first occupancy after January 26, 1993, the Property is an existing facility[.]" ECF No. 36 at 18–19. Therefore, Plaintiff pleads alternative claims for four claims in total under Title III of the ADA: (1) Failure to remove architectural barriers in an existing facility when the removal of those barriers was readily achievable in violation of 42 U.S.C.A. § 12182(b)(2)(A)(iv) and § 12182(b)(2)(A)(v); (2) failure to make reasonable modifications in policies, practices, or procedures necessary to accommodate Plaintiff's disability in an existing facility in violation of 42 U.S.C.A. § 12182(b)(2)(A)(ii); (3) failure to design and construct an accessible facility in violation of 42 U.S.C.A. § 12183(a)(1); and (4) failure to alter a facility in a way so that it is readily accessible to individuals with disabilities in violation of 42 U.S.C.A. § 12183(a)(2). ECF No. 36 at 19–20.

Here, Defendants' arguments are only relevant to dismiss Plaintiff's Title III claim for failure to make reasonable modifications in policies, practices, or procedures under subsection

(ii) of 42 U.S.C.A. § 12182(b)(2)(A).[1] With regard to a failure to accommodate claim under subsection (ii) of Title III, a failure to allege that a plaintiff made a pre-suit request for reasonable modification dooms plaintiff's claim as conclusory. Castillo v. Hudson Theatre, LLC, 412 F. Supp. 3d 447, 451 (S.D.N.Y. 2019). That is because, "before ADA liability may be triggered for failure to provide accommodations", a "plaintiff must show that defendants had notice of her disability . . . [and] has the initial duty to inform the [defendant] of a disability." Id.; Massachusetts v. E*Trade Access, Inc., 464 F. Supp. 2d 52, 58 (D. Mass. 2006) ("Under subsection (ii), a disabled plaintiff is required to request a reasonable modification in order to inform the operator of a public accommodation of his disability and to allow that operator to undertake suitable modifications."). As such, for a failure to provide accommodations claims, a plaintiff must demonstrate that "the defendant employed a discriminatory policy or practice; and . . . the defendant discriminated against the plaintiff based upon the plaintiff's disability by (a) failing to make a requested reasonable modification that was (b) necessary to accommodate the plaintiff's disability." Fortyune v. Am. Multi-Cinema, Inc., 364 F.3d 1075, 1082 (9th Cir. 2004). Courts have therefore reasoned that "in order for a defendant to be liable for discrimination on the basis of disability, 42 U.S.C.A. § 12182(a), the defendant must have had adequate knowledge of the plaintiff's disability. After all, a[ ] [defendant] can be expected to respond only to what it knows (or is chargeable with knowing)." Shaywitz v. Am. Bd. of Psychiatry & Neurology, 848

---

[1] Defendants have cited no jurisprudence for the proposition that a request for reasonable modification is necessary when a plaintiff asserts a claim for existing architectural barriers or failure to design, construct, or modify a newly constructed facility. For example, in asserting claims based on architectural barriers found in existing facilities under Title III of the ADA, a plaintiff must merely set forth the architectural barriers in the pleadings which violate the ADA and "allege a plausible claim that their removal is readily achievable." Medina-Rodríguez, 255 F. Supp. 3d at 343 ("Because the complaint sets forth twelve architectural barriers in violation of the ADA, each of which may be removed, Medina has pled sufficient facts to bring a Title III ADA claim."). Here, as already discussed above, Plaintiff has adequately alleged sixteen architectural barriers which violate the ADA and has plausibly claimed that their removal is readily achievable. ECF No. 36 at 8–13. As such, the court only addresses the Defendant's arguments that Plaintiff was required to plead a request for reasonable modification before filing suit under subsection (ii) of 42 U.S.C.A. § 12182(b)(2)(A).

F. Supp. 2d 460, 467 (S.D.N.Y. 2012) (citing Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791,

795 (1st Cir.1992)); Castillo, 412 F. Supp. 3d at 451. In such a way, the defendant's "notice of

the alleged disability . . . is an assumed prerequisite" of a Title III claim for a defendant's failure

to make reasonable accommodations. Shaywitz, 848 F. Supp. 2d at 466. Accordingly, a

plaintiff's failure to plead that he made request for reasonable accommodation *before* filing suit

renders the plaintiff's failure to accommodate claim conclusory, as illustrated in Castillo v.

Hudson Theatre, LLC, 412 F. Supp. 3d 447, 451 (S.D.N.Y. 2019).

      In Castillo, the plaintiff suffered from diabetes and sued two Broadway theaters in

Manhattan alleging that their policies "banning outside food" created "an access barrier

excluding people with metabolic disorders from full and equal enjoyment of the services

provided by Defendants' facilities." Id. at 448. The court concluded that Plaintiff's claim invoked

subsection (ii) of 42 U.S.C.A. § 12182(b)(2)(A) for the theaters' "failure to make reasonable

modifications in policies, practices, or procedures, when such modifications are necessary to

afford such goods, services, facilities, or accommodations to individuals with disabilities." Id. at

450 (citing 42 U.S.C.A. § 12182(b)(2)(A)(ii)). The court noted that notice of plaintiff's disability

is a prerequisite to make a Title III claim for failure to make reasonable accommodations, writing

that the plaintiff "has the initial duty to inform the [defendant] of a disability before ADA

liability may be triggered for failure to provide accommodations." Id. at 451. The court noted

that in her complaint the plaintiff "does not allege that she notified the Theaters that she needed

to bring in outside food due to her metabolic disorder" and that "she has not pleaded facts to

show that the injury is due to the Theaters' refusal to modify their policies to accommodate her

within the meaning of the ADA." Id. The court concluded that the plaintiff's failure to provide

notice of her disability to the Theaters so that they could then consider her need for accommodations was "fatal" to the plaintiff's claims. Id.

Second, the court in Castillo discussed how the plaintiff failed to "to allege that she requested a reasonable modification to Defendants' policies that was subsequently refused." Id. Although the plaintiff argued that the "policies and procedures on the Theaters' websites made it clear that the Theaters were unwilling to accommodate individuals with metabolic disorders" the court reasoned that "[w]ithout [the plaintiff] requesting an actual modification, . . . it is impossible to determine whether the Theaters were actually unwilling to accommodate [plaintiff], rendering her allegations merely conclusory." Id. at 451–52.

Finally, in Castillo the plaintiff argued that her failure to notify the defendants and request an accommodation was "excusable" as a "futile gesture" because the "[t]he ADA does not require a person with a disability to engage in a futile gesture [such as attempting to gain access to an inaccessible location] if such person has actual notice that a person or organization does not intend to comply [with the ADA]." Id. at 452 (citing 42 U.S.C.A. § 12188(a)(2) (internal quotations omitted)). The court rejected the plaintiff's argument, noting that she had not alleged any facts suggesting that she had "actual notice" that the Defendants would not comply with the ADA, "for example, that the Theaters maintained policies against individual exceptions to the no-outside-food rules or that the Theaters had a pattern of declining such requests, . . . or that an employee or agent of the Theaters warned her that she would not receive an accommodation if she requested it." Id. As such, the court in Castillo concluded that the "defects in [the plaintiff's] pleadings therefore cannot be excused on the basis that notice and a request for an accommodation would have been futile gestures." Id.

The facts and pleadings underlying Plaintiff's failure to accommodate claim under Title III of the ADA are analogous to those in Castillo. Like the Plaintiff in Castillo, nowhere in the complaint does Plaintiff allege affirmative, non-conclusory facts that (1) he requested a reasonable modification from either of the Defendants, or (2) that his request was subsequently refused by either Defendant.[2] Because Plaintiff does not allege any facts indicating that he made a request for reasonable modification and does not allege any facts that the Defendants denied such a request, he is only speculating as to whether either Defendant would have denied his request for reasonable modification. As in Castillo, without those allegations it is impossible to determine whether Plaintiff suffered discrimination due to a denial of reasonable accommodation, and Plaintiff's allegations in the complaint are merely conclusory.

Still, like the plaintiff in Castillo, Plaintiff argues that any request for a reasonable modification would have been a "futile gesture" under 42 U.S.C.A. § 12188(a)(1) because the architectural barriers at the Coliseum are also so "substantial and obvious" that they "evidence the null intention of the Co-defendant to adhere to the regulations of the ADA", and because the Defendants have litigated after the filing of the complaint rather than removing the alleged barriers. ECF No. 47 at 6–7; ECF No. 59 at 3. Plaintiff's arguments cannot prosper. As discussed in Castillo, 42 U.S.C.A. § 12188(a)(1) governs "futile gestures" and requires that Plaintiff have "actual notice that a person or organization . . . does not intend to comply with its provisions." 42

---

[2] The closest Plaintiff comes to such allegations are arguments he makes which are contained in Plaintiff's response in opposition to SMG's motion to dismiss. Plaintiff represents that "for knowledge of this Honorable Court, it is reported that Plaintiff **tried** to inform the security personnel of the Coliseum (since they were the closest people and the Plaintiff cannot travel certain distances due to his mobility disability) that the barriers did not allow his equal access and that modifications had to be made, but **there was no response of any kind**." ECF No. 47 at 7 (emphasis added). No such allegations are included in the amended complaint, and so Plaintiff's argumentation in his response motion cannot be considered for the purposes of a 12(b)(6) motion. Nevertheless, Plaintiff's argumentation communicates that he "tried" to inform security personnel, but Plaintiff does not (1) clarify whether his attempts were successful or (2) how not receiving any response from a security guard constitutes "actual notice" that Defendants would not accommodate Plaintiff.

U.S.C.A. § 12188(a)(1); <u>Castillo</u>, 412 F. Supp. 3d at 452. The mere existence of alleged barriers does not provide the kind of "actual notice" necessary to establish that requesting a reasonable modification would be denied by the Defendants. If it did, no Plaintiff would be required to request a reasonable accommodation after merely alleging that there were "substantial and obvious" barriers at the facility in question. Additionally, as explained in further detail below, the mere fact that Defendants have exercised their rights in defending a lawsuit *after* a complaint was filed does not show their lack of intent to adhere to the requirements of the ADA had Plaintiff made a reasonable request *before* filing suit.

In that same vein, Plaintiff's argument that he made the required request for reasonable modification by filing the complaint cannot stand. A request for modification is a "prerequisite" to bring a failure to accommodate claim, and such request must be made "before ADA liability may be triggered for failure to provide accommodations[.]" <u>Shaywitz</u>, 848 F. Supp. 2d at 466; <u>Castillo</u>, 412 F. Supp. 3d at 451. Because liability for failure to provide a reasonable modifications only arises *after* a plaintiff makes a request for reasonable accommodation and the defendant denies the plaintiff's request, Plaintiff's argument here puts the cart before the horse. A plaintiff must make a request directly to the defendants for reasonable modification *before filing suit*, thereby making the defendants aware of the problem and giving the defendants the opportunity to remedy the plaintiff's inability to access defendants' facilities without the need for an injunction. A plaintiff's cause-of-action for failure to accommodate is only triggered once the defendant is both aware and then refuses to make the reasonable modifications, thereby justifying the intervention of the court and the use of judicial resources. Plaintiff's failure to allege that he made a request for reasonable accommodation to either Defendant before filing suit is fatal to his claim for reasonable accommodation, rendering it conclusory. As such,

Plaintiff's claim under subsection Title III of the ADA for failure to make reasonable modifications in policies, practices, or procedures necessary to accommodate Plaintiff's disability in an existing facility in violation of 42 U.S.C.A. § 12182(b)(2)(A)(ii) should also be dismissed.

### b. Whether SMG Has a Contractual Relationship with the Authority

Finally, regarding Plaintiff's Title III claims against SMG, SMG argues vehemently that it is not the correct party to this suit because it has no contractual relationship with the Authority for the operation and management of the Coliseum and it, in fact, does not operate the Coliseum. ECF No. 37 at 6, 6–7 n. 1. Plaintiff responds that "according to [his] investigation, contractual obligations exist" between the Authority and SMG. ECF No. 47 at 8. An examination of the amended complaint reveals that Plaintiff does indeed affirmatively allege that,

> SMG Latin America, LLC, signed a contract with the public entity that owns the Coliseum of Puerto Rico, in which it acquired the responsibility of operating, maintaining the building, negotiating and obtaining the licenses and permits to maintain the Property in operation, among other obligations, for which it has the responsibility to eliminate architectural barriers, as well as discriminatory policies, practices and procedures in the public accommodation.

ECF No. 36 at 17, ¶ 35. Accepting as true Plaintiff's factual averment that there exists a contract between SMG and the Authority, and indulging all reasonable inferences in the Plaintiff's favor, the court must conclude for purposes of the motion to dismiss that SMG is the entity currently holding the contract to operate the Coliseum. See Doyle, 103 F.3d at 190. Nothing precludes SMG, however, from challenging Plaintiff's averment through a motion for summary judgment. Nevertheless, at this juncture of the proceedings, SMG's request to dismiss the amended complaint against it because it is not the correct party should be denied.

### D. PLAINTIFF'S ALLEGATIONS UNDER TITLE II OF THE ADA AGAINST THE PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY

Plaintiff's claims brought under Title II of the ADA against the Puerto Rico Convention Center District Authority pertain to the statutory provisions that prohibit discrimination against disabled persons by a "public entity." ECF No. 36 at 1, 16–17. As such, only public entities can be liable under Title II of the ADA. 42 U.S.C.A. § 12131; 42 U.S.C.A. § 12132; Maxwell v. S. Bend Work Release Ctr., 787 F. Supp. 2d 819, 821 (N.D. Ind. 2011). Generally, to plead a claim under Title II of the ADA, a plaintiff must allege (1) he is a qualified individual with a disability; (2) that he was excluded from the participation in or denied the benefits of a public entity's "services, programs, or activities or was otherwise discriminated against"; and (3) that his exclusion, denial of benefits, or discrimination was by reason of his disability. Parker v. Universidad de Puerto Rico, 225 F.3d 1, 5 (1st Cir. 2000); Iverson, 452 F.3d at 102.

### a. Whether the Puerto Rico Convention Center District Authority is a "Public Entity" under Title II

Regarding Plaintiff's Title II claims, the Authority first argues that is not a "public entity" under the meaning of Title II of the ADA, 42 U.S.C.A. § 12132 and 42 U.S.C.A. § 12131(1) and therefore Plaintiff cannot bring a Title II suit against it. ECF No. 39 at 9–22. Title II of the ADA establishes that "[t]he term 'public entity' means— (A) any State or local government; (B) any department, agency, special purpose district, **or instrumentality of a State or States or local government**[.]" 42 U.S.C.A. § 12131(1)(A)–(B) (emphasis added). Using this definition, an analysis of the legislation which created the Puerto Rico Convention Center District Authority undermines the argument that it is not a public entity under Title II of the ADA. Puerto Rico Act No. 351, known as the "Puerto Rico Convention Center District Act" created the Puerto Rico Convention Center District Authority. 23 L.P.R.A. § 6401 et seq. In that statute, the Puerto Rico

Legislature provided: "A corporate body politic is hereby created which will constitute a public corporation and **government instrumentality** with its own juridical personality, which shall be known as the 'Puerto Rico Convention Center District Authority'." 23 L.P.R.A. § 6403 (emphasis added).

Accordingly, the Puerto Rico statute creating the Authority specifically describes the Authority as a "government instrumentality"—one of the express categories for a public entity under Title II of the ADA. 42 U.S.C.A. § 12131(1)(B); Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1998) ("the statutory definition of public entity, . . . includes any department, agency, special purpose district, or other instrumentality of a State or States or local government.") (internal quotations omitted). The Puerto Rico Supreme Court has in the past interpreted the Legislature's express declarations to conclude that an entity "should be considered a public instrumentality of the Commonwealth of Puerto Rico, regardless of the private character it has preserved for certain specific ends." Pueblo v. Hernández Torres Barreda, 125 P.R. Dec. 560, 570 (1990) (regarding the Puerto Rico Telephone Company). The court can therefore conclude that the expressions of the Puerto Rico Legislature indicating that the Authority is a "government instrumentality", combined with the definitions under Title II of the ADA, establish that the Puerto Rico Convention Center District Authority is a "public entity" for the purposes of Title II of the ADA regardless of any private character the Authority may still maintain.[3]

---

[3] 23 L.P.R.A. § 6403 also describes the Authority as a "public corporation." Generally, a "public corporation" is defined as a "government-owned corporation that engages in activities that benefit the general public, usu[ally] while remaining financially independent. . . . [and] is managed by a publicly appointed board." CORPORATION, Black's Law Dictionary (11th ed. 2019). As such, public corporations are "created by the state for public purposes only, as an instrumentality to increase the efficiency of government, supply the public wants, and promote the public welfare." Id. As analyzed in detail below, these descriptions generally fit the nature of the Puerto Rico Convention Center District Authority, as it was (1) created by the state, (2) created with the intent that it engage in activities that benefit the general public, (3) is managed by a majority-publicly appointed board, and (4) maintains at least a degree of financial independence. Nevertheless, "public corporations serve a range of special purposes. Sometimes states

The Authority nevertheless asserts that its character is still more consistent with a private corporation than with a public entity and "that it appears to have both public and private features." ECF No. 53 at 2–4. The Authority therefore urges the court to apply the definitions found under the United States Department of Justice ("DOJ") ADA Title II Technical Assistance Manual ("TAM"), arguing that the TAM provides relevant guidance to the question of its status as a public entity and is entitled to deference. ECF No. 53 at 4. The ADA indeed designates the Attorney General as responsible for issuing regulations to implement the ADA, including Title II. 42 U.S.C.A. § 12134 (requiring the Attorney General to promulgate regulations implementing 42 U.S.C.A. § 12132). The regulations regarding Title II of the ADA adopt the definition of "public entity" contained in the ADA. 28 C.F.R. § 35.104 ("Public entity means—(1) Any State or local government; (2) Any department, agency, special purpose district, or other instrumentality of a State or States or local government . . . ."); see 42 U.S.C.A. § 12131(1)(A)–(B).

Consequently, the DOJ interpretation in the TAM seeks to address a perceived ambiguity as to what constitutes a "public entity" when "it is difficult to determine whether a particular entity that is providing a public service . . . is in fact a public entity" because the "entity appears to have both public and private features." U.S. DEP'T OF JUSTICE, AMERICANS WITH DISABILITIES ACT – TITLE II TECHNICAL ASSISTANCE MANUAL [WITH 1994 SUPPLEMENT], COMMENT 8-2.400A, II-1.2000. Accordingly, the TAM provides:

> Where an entity appears to have both public and private features, it is necessary to examine the relationship between the entity and the governmental unit to determine

structure these entities to be so closely tied to the state government—in terms, among other things, of how they are funded and how they are supervised—that they are properly understood to be "arms" of the state itself." Grajales v. Puerto Rico Ports Auth., 831 F.3d 11, 13 (1st Cir. 2016). Puerto Rico has also "created a number of special-purpose public corporations. And, it, too, has structured some of them to be very closely tied to the Commonwealth government and some to operate separate and apart from it." Id. In the end, it is enough to conclude that the Authority is an instrumentality of the government of Puerto Rico to qualify as a "public entity" for the purposes of Title II of the ADA.

whether the entity is public or private. Factors to be considered in this determination include—

1) Whether the entity is operated with public funds;

2) Whether the entity's employees are considered government employees;

3) Whether the entity receives significant assistance from the government by provision of property or equipment; and

4) Whether the entity is governed by an independent board selected by members of a private organization or a board elected by the voters or appointed by elected officials.

Id. The DOJ's interpretation of its regulation regarding what constitutes a "public entity" is entitled deference, so long as "the language of the regulation is ambiguous and the interpretation is not plainly erroneous or inconsistent with the regulation. Barden v. City of Sacramento, 292 F.3d 1073, 1077 (9th Cir. 2002) (citing Auer v. Robbins, 519 U.S. 452, 461 (1997)); Johnson v. City of Saline, 151 F.3d 564, 570 (6th Cir. 1998) (citing Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)). The factors in the TAM regarding the definition of a "public entity" are not plainly erroneous or inconsistent with the regulation regarding public entities. Although in this case, the plain language and express intent of the Puerto Rico Legislature in establishing the Authority clearly establishes it as a public entity for the purposes of Title II of the ADA, for the sake of thoroughness the court will nevertheless consider each of the factors enumerated by the TAM in examining the statutory nature of the Authority.[4]

### (1) Whether the Authority is operated with public funds

The first factor requires an examination of whether the Authority is operated by public funds. The Puerto Rico Convention Center District Act, 23 L.P.R.A § 6412, delineates several sources of funding for the Authority which are not evidently public funds. For example, the

---

[4] In conducting this analysis, the court does not rely on any factual assertions not contained in the amended complaint or incorporated therein. Instead, the court relies on the provisions contained in the Puerto Rico Convention Center District Act, 23 L.P.R.A. § 6401 et seq., to determine the character of the Authority and any other applicable jurisprudence. Any remaining relevant and well-pleaded factual averments contained in the complaint are accepted as true and all reasonable inferences are made in Plaintiff's favor.

Authority is authorized to "[s]ell or dispense, or allow others to sell or dispense alcoholic beverages to be consumed in the Center and the District" and to "[l]end money from the proceeds of the sale of bonds or otherwise, with the purpose of financing the costs of the Center, the improvement projects and projects on private parcels, or in the District, and to further any of the purposes of the Authority." 23 L.P.R.A § 6412(dd), (ee). Under 23 L.P.R.A. § 6446, the bonds issued by the Authority are not to "constitute a debt of the Government of the Commonwealth of Puerto Rico or any of its political subdivisions, and neither the Government of the Commonwealth of Puerto Rico nor any of its political subdivisions shall be liable for them, and said bonds shall be payable solely from those funds that have been set aside for their payment." 23 L.P.R.A. § 6446.

Nevertheless, the Authority also receives tax funds for its operations that are undoubtably public funds. First, the Authority is authorized to "[r]eceive, administer, and use funds from the District Improvement Fund, as provided in § 6469a of this title." 23 L.P.R.A. § 6412(ff). The District Improvement Fund was created to be:

> exclusively used by the Authority . . .
> (1) To create reserves and provide a collateral security for the payment of the principal and interest on financings granted by the Authority for Improvement Projects in the District.
> (2) To grant loans for Improvement Projects in the District. [and]
> (3) To finance construction and maintenance works conducted by the Authority in the District.

23 L.P.R.A. § 6469a(a). The District Improvement Fund is "nourished from the appropriation" of the "sales and use tax" established under 13 L.P.R.A. §§ 32021 and 32022. 23 L.P.R.A. § 6469a(b). Indeed, 13 L.P.R.A. § 32126 directs that "fifty percent (50%) of the sales and use tax . . . shall be deposited in the District Improvement Fund created under § 6469a of Title 23, and

transferred to the Puerto Rico Convention Center District Authority" between the "periods

beginning as of July 1, 2014, and ending before July 1, 2064[.]" 13 L.P.R.A. § 32126.

Additionally, Puerto Rico Convention Center District Act empowers the Authority to

"determine the use and investment of its funds, including the occupancy tax revenues assigned

pursuant to the provisions of § 9084 of Title 13, as amended[.]" 23 L.P.R.A § 6412(cc). Indeed,

the Puerto Rico government enacted the Act No. 272, the Puerto Rico Room Occupancy Rate

Tax Act, "to facilitate financing" of San Juan Convention Center. In re Fin. Oversight & Mgmt.

Bd. for Puerto Rico, 618 B.R. 642, 647 (D.P.R. 2020) (citing 13 L.P.R.A. § 2271 et seq.). Under

the Puerto Rico Room Occupancy Rate Tax Act, a tax is levied on certain categories of lodgings

such as motels and all-inclusive hotels per the "room occupancy rate, and the period of

occupation of the room." 13 L.P.R.A. § 2271o. Such funds are then distributed by the Puerto

Rico Tourism Office by order of priority. 13 L.P.R.A. § 2271v. By law, five percent of the

occupancy tax would be made available to the Authority,

> [a]s of the year in which the Authority certifies to the Department of the Treasury
> and the Office of Tourism, the start of operations of the Convention Center, and
> during the subsequent ten (10) years, . . . to cover any shortfall, if any, arising
> from the operations of the facilities that operate the Convention Center District
> Authority, in reserve that will maintain the Office of Tourism.

13 L.P.R.A. § 2271v(2). Additionally, the Room Occupancy Tax Rate Act specifies that "Two

million five hundred thousand dollars ($2,500,000) will be transferred by the Office of Tourism

to the Convention Center District Authority in quarterly contributions of six hundred twenty-five

thousand dollars ($625,000.00) to cover the costs associated exclusively with the operation of the

Convention Center District." 13 L.P.R.A. § 2271v(3).

The aforementioned public funds available to the Authority are enough to resolve this

factor in favor of a finding that the Authority is a public entity. The court need not explore every

avenue of revenue available to the Authority under Puerto Rico Law. Even if true that the Authority derives a significant part of its revenue from operations of a private nature, it is clear that the Authority also receives and uses public funds for construction and operations carried out by the Authority. It is difficult to envision private corporations entitled to receive sales tax funds or occupancy tax funds to finance their operations. Therefore, the first factor under the TAM weighs in favor of finding that the Authority is indeed a public entity.

### (2) Whether the Authority's employees are considered government employees

Next, the court turns to whether the Authority's employees are considered government employees. The Puerto Rico Convention Center District Act enables the Authority to

> Appoint and hire all the officials, representatives, employees or managers that are required for the performance of its duties, fix and determine their qualifications, duties and remuneration, and retain or employ other agents or consultants, including, but not limited to architects, auditors, engineers, lawyers and private consultants, by contract or otherwise, to render and provide professional or technical services and advice.

23 LPRA 6412(l). Specifically, the Authority's Executive Director is tasked with selecting "the personnel deemed necessary to perform the functions of the Center and the Puerto Rico 'José Miguel Agrelot' Coliseum, and to appoint said personnel without being subject to former §§ 1461 et seq. of Title 3, known as the 'Public Service Human Resources Administration Act of the Commonwealth of Puerto Rico', but subject to the rules and regulations adopted by the Board to such effect." 23 LPRA 6411(e)(6).[5] The Authority argues that because its employees appointed by the Executive Director are not subject to the amended Government of Puerto Rico Human Resources Administration and Transformation Act, 3 L.P.R.A. § 1469 et seq they are more like private employees rather than public service employees. ECF No. 39 at 18. The

---

[5] The Public Service Human Resources Administration Act, 3 L.P.R.A. §§ 1461–1467b was repealed effective February 3, 2017. 3 L.P.R.A. § 1461 to 1467b.

Government of Puerto Rico Human Resources Administration and Transformation Act created a "System . . . entirely consistent with collective bargaining, for the main purpose of applying, reinforcing, evaluating, and upholding the merit system in the public service." 3 L.P.R.A. § 1471. Said system "shall be administered by the Government of Puerto Rico Human Resources Administration and Transformation Office and all public agencies and instrumentalities of the Government of Puerto Rico shall be part thereof as sole employer, **except as otherwise provided by law**." 3 L.P.R.A. § 1471 (emphasis added). As such, the Legislature of Puerto Rico possesses the prerogative to exempt employees who might otherwise be government employees from the Puerto Rico Human Resources Administration and Transformation Act. The mere fact that the employees of the Authority are exempt from the public service merit system does not conclusively establish that its employees are not government employees. Based on the foregoing, it is clear that the Authority has considerable authority over its employees. However, the Authority's arguments fail to conclusively show that its employees are not government employees.

### (3) Whether the Authority receives significant assistance from the government by provision of property or equipment

The third factor asks whether the Authority receives significant assistance from the government by provision of property or equipment. This factor is addressed by Plaintiff in the amended complaint, who alleges that the Coliseum at issue in the lawsuit is a "public facility" and that the "facilities that make up the Coliseum of Puerto Rico are ascribed to the Puerto Rico Convention Center District Authority" which was empowered by statute to

> own, finance, acquire, dispose of, lease, sublease, sell, transfer, plan, design, develop, build, operate, maintain, repair, replace, manage, market, improve and promote, for itself or by contract with third parties, the Center, or any portion thereof, the private parcels and projects on the private parcels and any other related or supporting projects or services, and cause the development,

construction, expansion, operation, administration, improvement, promotion of the Center, private plots and projects on private plots.

ECF No. 36 at 5. With regard to this allegation, the Authority admits that "the properties transferred to the Authority were formerly government assets, which are, indeed, properties 'provided' (transferred) by the government to the Authority at its inception[.]" ECF No. 39 at 21. Therefore, at a minimum, it is undisputed that the Authority, at its inception, received a significant provision of property by the government of Puerto Rico.

Furthermore, unlike any private corporation, the Puerto Rico Convention Center District Act empowers the Authority to "[t]he exercise of eminent domain" which "shall be requested by the Board in the name and on behalf of the Authority for the acquisition, use, usufruct, lease of any right or interest in the real or personal property subject to expropriation." 23 L.P.R.A. § 6414. The Authority's power of eminent domain strongly indicates the Puerto Rico Legislature's intent to provide significant property assistance to the Authority and highlights the Authority's character as an instrumentality of the government and a public entity. Additionally, as already discussed above, the Authority also receives a non-trivial quantity of public funds from the government which are derived from tax revenue. All told, the significant government assistance in property which the Authority enjoys weighs strongly in favor of a finding that the Authority is a public entity.

### (4) Whether the Authority is governed by an independent board selected by members of a private organization or a board elected by the voters or appointed by elected officials

The fourth and final factor under the TAM requires scrutiny as to whether the Authority is governed by an independent board selected by members of a private organization or a board elected by the voters or appointed by elected officials. The Authority urges that because six of the nine members on its board work in the private sector, the Authority must be a private entity.

ECF No. 39 at 19–20. Once again, the answer to this question lies in the statute which created

the Authority. The Puerto Rico Convention Center District Act establishes that

> The Board shall be composed of nine (9) members, three (3) of whom shall be ex
> officio members; one (1) shall be a graduate-level professor in the field of
> humanities or liberal arts; one (1) shall be a professor or professional with a
> graduate degree in engineering, planning, or real estate; one (1) shall be an
> attorney with at least seven (7) years of experience practicing law in Puerto Rico;
> one (1) shall be a person with extensive knowledge and experience in corporate
> finances; one (1) shall be a renowned person in the field of the arts, culture, or
> sports in Puerto Rico; and one (1) shall be a representative of the private sector
> with experience in the field of marketing, tourism, hotels, or the operation of
> convention centers.

23 L.P.R.A. § 6411(a). As such, the Puerto Rico Legislature has dictated who may sit on the

board of the Authority and what professional or educational backgrounds six of the members

must possess. Of greater importance than even the composition of the Board of the Authority is

the fact that the Puerto Rico Convention Center District Act establishes that "[e]xcept for the

three (3) ex officio members, the Governor shall appoint the members of the Board, with the

advice and consent of the Senate" and that "[t]he term of appointment of such six (6) Board

members shall be four (4) years or until their successors take office." 23 L.P.R.A. § 6411(b). As

such, two-thirds of the members of the board are appointed by the Puerto Rico Governor and

upon confirmation by the Senate. Thus, the fourth and final factor under the TAM also weighs in

favor of a finding that the Authority is a public entity.

In sum, an analysis of both the statutory language which established the Puerto Rico

Convention Center District Authority and an examination of the factors contained in the DOJ

Technical Assistance Manual indicate that the Authority is a public entity. The Puerto Rico

Convention Center District Act clearly defines the Authority as a "government instrumentality"

which would qualify it as a public entity under Title II of the ADA. Even so, the Authority would

have the court believe that an entity which as a matter of law was founded using government

property, empowered to exercise eminent domain, enjoys a budget buoyed by tax dollars, and two-thirds of whose board is appointed by elected officials was nevertheless "set up" in a manner "more consistent with its private nature." ECF No. 53 at 3. Such argument does not hold water. For the aforementioned reasons, the request of the Authority to dismiss the amended complaint because it is not a public entity subject to suit under Title II of the ADA should be denied.[6]

### b. Whether the Authority Provides "services, programs, or activities"

The Authority next argues that it cannot be liable under Title II of the ADA because the Authority does not provide "services, programs, or activities." ECF No. 39 at 11, 24–25. Specifically, the Authority maintains that it "does not provide a service to the people of Puerto Rico," because it only owns a facility for which it then contracts with a private operator and with private vendors to operate the Coliseum. ECF No. 39 at 23–24. The ADA does not define the meaning of "services, programs, or activities." Frame v. City of Arlington, 657 F.3d 215, 226 (5th Cir. 2011); see also Parker, 225 F.3d at 5. However, the Rehabilitation Act defines "program or activity" to mean "all the operations of . . . a local government." Frame, 657 F.3d at 225. Generally, the ADA and the Rehabilitation Act are interpreted *in pari materia*. Id. at 223. In fact, Title II of the ADA was modeled on § 504 of the Rehabilitation Act. Parker, 225 F.3d at 4. The

---

[6] The Authority also contends that the Plaintiff is fully aware that the Authority is not a public entity because "[P]laintiff's counsel . . . filed a prior lawsuit against the Authority and the former operating entity at the Coliseo de Puerto Rico, **under Title III of the ADA**." ECF No. 39 at 27 (emphasis in original). The Authority references the case Jonathan Álvarez-Vega v. Evertec Group LLC et al, Civil Case Number 15-2263, which the court notes under its prerogative to take judicial notice of the contents of its own docket. In the Amended Complaint of the Jonathan Álvarez-Vega case, however, Plaintiff in fact raised alternative claims under **both** Title II and Title III of the ADA toward the Coliseo de Puerto Rico. ECF No. 97 at 12, ¶ 21; 14, ¶ 29–30; 16 in Case No. 15-2263. Furthermore, no motions to dismiss or motions for summary judgment addressing the issue of the Authority's status as a public entity were raised by the parties or decided by the court. ECF Nos. 104, 105, 106 in Case No. 15-2263. Given that (1) the Jonathan Álvarez-Vega case was filed invoking both Title II and Title III of the ADA, and (2) the case was settled without the court making any pronouncements as to the public or private nature of the Puerto Rico Convention Center District Authority under Title II of the ADA, the contents of the docket and the settlement reached in that case have no bearing on the resolution of the issues in the present lawsuit.

ADA even commands that "[e]xcept as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. 790 et seq.)[.]" 42 U.S.C.A. § 12201(a); Bragdon v. Abbott, 524 U.S. 624, 632–33 (1998) ("The directive [of 42 U.S.C.A. § 12201(a)] requires us to construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act."). The First Circuit Court of Appeals has announced that, "[i]n applying Title II, therefore, we rely interchangeably on decisional law applying § 504 [of the Rehabilitation Act]." Parker, 225 F.3d at 4. Accordingly, courts have construed the meaning of "services, programs, or activities" broadly to mean "all the operations of . . . a local government" or "all the activities of a public entity." Frame, 657 F.3d at 226 ("all the operations of . . . a local government"); Johnson, 151 F.3d at 570 ("To summarize, 'programs, services, and activities,' include all of the activities of a public entity.").

Such a broad interpretation of "services, programs, and activities" is supported by the opinion of the First Circuit Court of Appeals in Parker v. Universidad de Puerto Rico, 225 F.3d 1 (1st Cir. 2000). In Parker, the plaintiff sued under Title II of the ADA when he suffered injuries after his wheelchair overturned during a visit to the Botanical Gardens of the University of Puerto Rico. Id. at 2. In that case, there was not dispute that the Botanical Gardens, being part of the University of Puerto Rico was a public entity under Title II of the ADA, serving "as a laboratory for study, research, and conservation" but was "also open to the general public for recreational use." Id. at 3. At the time of the plaintiff's accident, the Botanical Gardens was acting as a venue in hosting an awards ceremony by the Girl Scouts of America—a private organization. Id. While attempting to attend that ceremony, the plaintiff's wheelchair overturned on a path leading to the gardens and caused him injuries. Id.

In its opinion, the court in <u>Parker</u> concluded that the plaintiff had been denied access to the University of Puerto Rico's "services, programs, or activities" in violation of Title II of the ADA. <u>Id</u>. at 5. The court reasoned that: "One purpose of the Botanical Gardens is to serve as a venue for group events. The University holds open the Monet Garden as a place for group convocations, like the Girl Scouts awards ceremony that [the plaintiff] attended. The University, therefore, has a duty to make the Monet Garden readily accessible to and usable by individuals with disabilities." <u>Id</u>. at 6 (internal quotations omitted). In so doing, the court in <u>Parker</u> treated the Girl Scout ceremony at the Botanical Garden as part of the University's services, programs, or activities, because such events fell within the purpose of the Botanical Garden.[7]

The reasoning in <u>Parker</u> is applicable here. In creating the Authority, the Puerto Rico Legislature announced that the Authority was created with the intent to attract,

> nonresident visitors to Puerto Rico through the development of a suitable convention, trade and exhibition center and supporting facilities, it is expected that substantial economic development will be stimulated in such tourism-related industries as transportation, hotels, restaurants, recreation, entertainment and retail sales establishments. Stimulation of these service industries will in turn promote the overall economic development of Puerto Rico, encourage private investment and development and provide new and enhanced employment opportunities, thereby providing significant benefits to the general welfare of the people of Puerto Rico.

---

[7] The <u>Parker</u> case dealt with the Botanical Gardens as an "existing facility" where "[u]nlike Title III . . . which requires removal of architectural barriers whenever to do so would be "readily achievable," . . . a public entity "is not required to make structural changes in existing facilities where other methods are effective in achieving compliance, [28 C.F.R.] § 35.150(b)(1). If one facility is inaccessible, for example, a public entity can achieve compliance with the ADA by moving its services, programs, or activities to another facility that is accessible." <u>Parker</u>, 225 F.3d at 6. In contrast, facilities constructed after January 26, 1992 must be "be designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities" and if altered "by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities, if the alteration was commenced after January 26, 1992." 28 C.F.R. § 35.141(a)(1), (b)(1). The Plaintiff alleges that the Coliseum was constructed after January 26, 1992, which the court takes as true for the purposes of the motion to dismiss. ECF No. 36 at 20. As such, the Authority's obligations under Title II of the ADA in constructing its facilities in an accessible manner are arguably more stringent than the obligations imposed by the court on the Botanical Gardens in <u>Parker</u> as an existing facility.

Statement of Legislative Intent of Act No. 351 (H.B. 3034) (2000 P.R. Laws, Part 1 at 119–20).

In pursuit of those goals, the Authority's stated purpose under the Puerto Rico Convention

Center District Act is to:

> possess, finance, acquire, dispose of, lease, sublease, sell, transfer, plan, design,
> develop, construct, operate, maintain, repair, replace, administer, market, improve
> and promote on its own or through a contract with third parties, the Center or any
> portion thereof, the private parcels and projects in the private parcels and any
> other project, or related or support service, and promote the development,
> construction, expansion, operation, administration, improvement and promotion
> of the Center, the private parcels and the projects in the private parcels, subject to
> the provisions of this chapter.

23 L.P.R.A. § 6404. Among these purposes, the Authority is intended to **operate** the properties

belonging to it either "on its own or through a contract with third parties." 23 L.P.R.A. § 6404.

As already concluded above, the Authority is a public entity under Title II of the ADA, and

therefore, any of its activities to operate its facilities in pursuit of its stated goals of stimulating

tourism through events offered to the public such as concerts and other entertainment fall within

the purview of its "services, programs, and activities" as a public entity—even if the actual

operation of a facility during events is contracted to a third party. Therefore, like the Girl Scout

event in Parker—an event by a private organization which was hosted by a public entity—the

events which the Authority hosts at its properties, even if operated by third parties and put on by

private entities, fall within the purpose of the Authority as a public entity. As such, it has an

obligation to ensure that no person is denied access to those services, programs, or activities as a

result of disability discrimination. Because the Puerto Rico Convention Center District Authority

is a public entity providing "services, programs, or activities" which Plaintiff alleges he was

prevented from accessing as a result of disability-based discrimination, the Authority's motion to

dismiss with regard to Plaintiff's Title II claims under the ADA should be denied.

### c. Whether Plaintiff can Plead in the Alternative Against the Authority Under Title III

The Authority further notes that Plaintiff pleads an alternative claim under Title III of the ADA and argues that under the ADA framework, it cannot be liable under both Title II and Title III of the ADA. ECF No. 39 at 27–28. Plaintiff maintains that the Authority is a public entity, but argues that if "the legal, statutory and factual conditions were to change" then Title III would apply to the Authority. ECF No. 48 at 13. Only public entities can be sued under Title II of the ADA. Iverson, 452 F.3d at 99. Conversely, Title III of the ADA "targets discrimination by privately operated places of public accommodation[.]" Id. A plaintiff is usually free to plead alternative and inconsistent theories of recovery. Lass v. Bank of Am., N.A., 695 F.3d 129, 141 (1st Cir. 2012). However, because as explained above, the Authority is a public entity as a matter of law, subjecting it to suit under Title II rather than under Title III, Plaintiff's alternative claims against the Authority under Title III should be dismissed.

### d. Whether Plaintiff can Request Compensatory Damages under Title II

Finally, the Authority argues that Plaintiff is not entitled to claim any damages, even nominal, under Title II of the ADA because Plaintiff has failed to allege that he was subject to intentional discrimination by the Authority. ECF No. 39 at 28–30. Plaintiff responds that he is entitled to money damages and that he adequately alleged intentional discrimination in the amended complaint. ECF No. 48 at 11–12.

The Supreme Court has made clear that Title II of the ADA "authorizes suits by private citizens for money damages against public entities that violate § 12132." United States v. Georgia, 546 U.S. 151, 154 (2006). However, a private plaintiff is only entitled to compensatory damages under Title II of the ADA "for intentional discrimination." Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 126 (1st Cir. 2003). In the absence of an allegation or proof of actual

compensable harm, the plaintiff "may only be entitled to no more than nominal damages, but his claim is sufficient to survive a motion to dismiss." CRC Health Grp., Inc. v. Town of Warren, 2014 WL 2444435, at *13 (D. Me. Apr. 1, 2014) (citing Means v. St. Joseph Cnty. Bd. of Comm'rs, 2011 WL 4361567, at *6 (N.D. Ind. Sept. 16, 2011)). Nevertheless, a plaintiff must allege sufficient facts in the complaint "that would render the discriminatory intent element plausible" otherwise a motion to dismiss a request for compensatory damages under Title II may be granted. Huertas León v. Colón-Rondon, 376 F. Supp. 3d 167, 182 (D.P.R. 2019); see Torres v. Junto De Gobierno De Servicio De Emergencia, 91 F. Supp. 3d 243, 254 (D.P.R. 2015) ("At this stage in the litigation, Plaintiff has sufficiently plead that Defendants intentionally discriminated against him by firing him due to his disability. Whether Defendants' actions were motivated by animus towards the disabled is an issue that will need to be addressed on summary judgment.").

In this case, the Plaintiff has not made an allegation of actual compensable harm and has only requested "[n]ominal damages amounting to one dollar" in the amended compliant. ECF No. 36 at 21. However, the Plaintiff has made adequate allegations of intentional discrimination. In the amended complaint, the Plaintiff alleges that the Coliseum has been "intentionally maintained . . . in its current condition" and that the Coliseum, including its policies, practices, and procedures, have not been altered "to bring it into compliance with accessibility standards." ECF No. 36 at 14–15. While that initial statement strikes the reader as conclusory, the Plaintiff goes into greater detail in the following paragraph, stating:

> Plaintiff believes, and therefore affirmatively alleges, that the discriminatory intent includes the conscious and considered refusal not to adhere to relevant construction standards; the disregard for the construction plans and permits issued for the [the Coliseum]; the conscientious decision to maintain the architectural design (as it currently exists) on the Property; the decision not to remove the

36

architectural barriers and maintain the Property in a state of non-compliance, motivated by profit.

ECF No. 36 at 15. In short, Plaintiff alleges discriminatory intent evidenced by the existence of construction standards, plans, designs, and permits for the Coliseum which have been intentionally ignored. It should be left to summary judgment to determine whether there in-fact exists plans, designs, and permits for the Coliseum which abide by the ADA but which have not been followed in the construction and operation of the Coliseum. At this juncture, therefore, the Authority's request to dismiss Plaintiff's claim for money damages should be denied.

## IV.    CONCLUSION

For the aforementioned reasons, the motions to dismiss filed by SMG Latin America, LLC and the Puerto Rico Convention Center District Authority should be GRANTED IN PART and DENIED IN PART. First, Plaintiff's alternative claims against the Puerto Rico Convention Center District Authority under Title III of the ADA should be dismissed in their entirety. Second, Plaintiff's reasonable accommodation or modification claim under Title III of the ADA, 42 U.S.C.A. § 12182(b)(2)(A)(ii) against SMG should also be dismissed. Finally, the conclusory allegations contained in paragraphs "d)", "e)", and "k)" of the amended complaint regarding the dimensions and configuration of the parking lot and the entrance of the Coliseum should also be dismissed and stricken from the amended complaint. ECF No. 36 at 8–10. The remaining requests to dismiss Plaintiff's amended complaint contained in both Defendants' motions to dismiss should be DENIED.

The parties have fourteen (14) days to file any objections to this report and recommendation unless otherwise ordered by the court. Failure to file the same within the specified time waives the right to object to this report and recommendation. Fed. R. Civ. P. 72(b)(2); Fed. R. Civ. P. 6(c)(1)(B); D.P.R. Civ. R. 72(d); <u>see also</u> 28 U.S.C. § 636(b)(1); <u>Henley</u>

<u>Drilling Co. v. McGee</u>, 36 F.3d 143, 150–51 (1st Cir. 1994); <u>United States v. Valencia</u>, 792 F.2d

4 (1st Cir. 1986).

      IT IS SO RECOMMENDED.

      In San Juan, Puerto Rico, this 6th day of March, 2023.

<u>s/Marcos E. López    </u>
U.S. Magistrate Judge
